CHAPMAN AND CUTLER LLP
Steven Wilamowsky
1270 Avenue of the Americas
New York, NY 10020-1708
Telephone: 212.655.6000

-and-

Aaron M. Krieger, *S.D.N.Y. admission pending*
111 West Monroe Street
Chicago, IL 60603-4080
Telephone: 312.845.3000

*Proposed Counsel for the Debtor and*
*Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
| | |
|---|---|
| In re | : Chapter 11 |
| | : |
| Retrieval-Masters Creditors Bureau, Inc.,[1] | : Case No. 19-23185 (___) |
| | : |
| Debtor. | : |

-----------------------------------------------------------x

## DECLARATION OF RUSSELL H. FUCHS
## PURSUANT TO LOCAL BANKRUPTCY RULE 1007-
## 2 AND IN SUPPORT OF "FIRST DAY" MOTIONS

I, Russell H. Fuchs, Chief Executive Officer of the debtor and debtor in possession in the above captioned chapter 11 case, hereby declare under penalty of perjury:

1.      I am the founder and Chief Executive Officer of the debtor and debtor in possession in the above-captioned case, Retrieval-Masters Creditors Bureau, Inc. (the "**Debtor**"). In such capacity, I am familiar with the history, operations, business, and financial affairs of the Debtor.

---

[1]    The last four digits of the Debtor's taxpayer identification number are 9495. The location of the Debtor's service address for purposes of this chapter 11 case is 4 Westchester Plaza, Suite 110, Elmsford, New York. The Debtor also does business as American Medical Collection Agency.

2. I submit this declaration (this "**Declaration**") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**"): (a) in support of the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"); (b) to explain to the Court and other interested parties the circumstances that led the Debtor to seek relief under chapter 11; and (c) in support of the motions and applications for relief filed concurrently herewith and discussed herein (collectively, the "**First Day Motions**").

3. I founded the Debtor in 1977, and therefore have a total of over 40 years of experience working for the Debtor.

4. I have reviewed the First Day Motions or otherwise had their contents explained to me and, to the best of my knowledge as I have been able to ascertain after reasonable inquiry, I believe that approval of the relief requested therein is necessary to permit the Debtor an effective transition into chapter 11 and to provide the best opportunity for a cost effective and orderly liquidation of the Debtor in a way that will maximize the value of its estate.

5. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the Debtor's business operations, my review of relevant documents, information provided to me, and/or my opinion based upon my experience, knowledge and information concerning the Debtor's operations and financials. Unless otherwise stated, the financial information contained in this Declaration is unaudited and subject to change.

6. I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

7. This Declaration is divided into three parts. **Part I** provides an overview of the Debtor's business, including a brief historical backdrop and and the circumstances leading to the

commencement of its chapter 11 case. **Part II** sets forth the relevant facts in support of each of the First Day Motions. **Part III** provides the information required by Local Bankruptcy Rule 1007-2.

I. **Overview**

*A. General History and Background*

8. The Debtor is a debt and medical receivables collection agency that was founded in 1977 in New York City. Over time, the business grew into a thriving agency and, in 1995, relocated to Elmsford, New York, where it is currently domiciled.

9. The Debtor's initial focus was small-dollar receivables collections for direct mailer marketers with businesses that involved shipping items to consumers on a periodic basis, who would only be required to make payment after receipt, and only if they chose to keep the items rather than return them. Well-known examples would be the various "book of the month"-type book and record clubs that were prolific in the decades immediately prior to the e-commerce revolution.

10. Very soon after, the Debtor also began doing a significant portion of its business collecting patient receivables for clinical diagnostic laboratories, another industry well-suited to the Debtor's expertise, because services (such as blood testing, urine testing, *etc.*) are typically provided by third party clinical laboratories that provide the results to physicians but then bill the patients separately for such services. The Debtor conducted this side of its business under the trade name American Medical Collection Agency ("**AMCA**"), and still does so today.

11. With the emergence of the internet economy in the late 1990's, the Debtor's business mix began to shift. On the one hand, technology proved severely disruptive to direct mail marketing. Among other things, the availability of digital music and reading materials, as

well as the explosive growth of online book sales, meant that certain products that traditionally were particularly well-suited for direct marketing, such as books, cassettes, and CD's, no longer were.[2] As those businesses faded, the need for the Debtor's services in collecting receivables that those businesses generated correspondingly diminished as well.

12. At the same, time, however, the health care industry continued to grow and evolve in a way that resulted in dramatic industry consolidation in the clinical laboratory segment. Smaller laboratories that had historically been the Debtor's clients combined into larger entities, and ultimately merged into laboratory networks that were still larger yet. Throughout this consolidation, the Debtor's strong reputation and industry niche (*i.e,* expertise at processing very high volumes of receivables with very small balances) allowed it to continue to grow with its customers and maintain and consolidate its client base. Indeed, at the time of the events that precipitated the Debtor's chapter 11 case, the two largest clinical laboratory systems in the country (Quest Diagnostics and Laboratory Corporation of America ("**LabCorp**")) were the Debtor's two largest clients. Similarly, upon information and belief, the Debtor was the largest outside collection agency vendor for each of those two laboratory systems.

B. *The Debtor's Information Technology*

13. The Debtor's business, by its very nature, requires it to collect and maintain data transmitted to it by its clients that includes personally identifiable information about third-party debtors that could include names, home addresses, social security numbers, bank account information for consumers choosing to pay online by check and, for consumers choosing to pay their outstanding balances by credit card, credit card information. In the case of the AMCA

---

[2] Newer subscription models that emerged in recent years, such as prepare-at-home meal kits, all involve credit card or other electronic payment being taken from the customer prior to or contemporaneously with shipping.

business, that information might also include dates of birth and certain medical information related to any laboratory tests for which payment is sought.[3]  In all, at any given time, the Debtor would have held tens of millions of individual points of data regarding millions of individual persons, none of which could be handled without a robust IT system.

14.    The Debtor's original IT architecture was built around an IBM mainframe-based system that ran on COBOL[4] and served the Debtor's purposes well for many years.  However, with ever-increasing market demands for enhanced interconnectivity between the Debtor's and its clients' systems, as well as for web-based interaction with both the Debtor's clients and its clients' consumer and patient-debtors, it was clear that continued reliance on the Debtor's internet-unconnected mainframe system would not be tenable in the long term.

15.    Accordingly, in 2015, after several years of internal planning and development, the Debtor began to transition to a proprietary, server-based, network-connected system.  The Debtor invested over a million dollars in the new system, employing outside IT consultants to ensure that the system would reflect current technological standards, including, importantly, appropriate data security protocols.

C.  *The Data Breach*

16.    In March, 2019, after forty years in business with no known data security incidents of any kind, the Debtor became aware of what turned out to be a major data breach that apparently had occurred sometime during the prior year.  The Debtor first learned that there

---

[3]  Such data facilitates the lawful and effective collection of outstanding debt.  For example, a debtor's date of birth is important because, among other things, applicable law governing debt collection typically prohibits the sending of a collection letter to a minor.

[4]  COBOL is an acronym for common business-oriented language, a surprisingly resilient high level programming language that was created in the late 1950's, but which remains in use even today.  *See, e.g.,* "How COBOL Still Powers The Global Economy At 60 Years Old," *Texas Public Radio,* May 23, 2019, available at https://www.tpr.org/post/how-cobol-still-powers-global-economy-60-years-old.

might be a problem when it received a series of "CPP notices" that suggested that a disproportionate number of credit cards that at some point had interacted with the Debtor's web portal were later associated with fraudulent charges.[5] In response, the Debtor shut down its web portal to prevent any further compromises of customer data, and engaged outside consultants who were able to confirm that, in fact, the Debtor's servers (but not the Debtor's residual mainframe) had been hacked as early as August, 2018. This knowledge led to the following cascade of events that ultimately has resulted in the Debtor's need to seek relief under chapter 11 of the Bankruptcy Code in this Court.

17. Most critically, as a result of the discovery of the data breach and its aftermath, the Debtor suffered a severe drop-off in its business. Almost immediately upon learning of the breach, LabCorp unqualifiedly and indefinitely terminated its relationship with the Debtor. Soon after, Quest Diagnostics, Conduent, Inc., and CareCentrix, Inc. which together with LabCorp were the Debtor's four largest clients, stopped sending new work to the Debtor, and all terminated or substantially curtailed their business relationships with the Debtor.

18. In addition, while the Debtor was and has always been adequately capitalized to operate its business, the data breach resulted in enormous expenses that were beyond the ability of the Debtor to bear. Among other things, the breach required the Debtor to hire IT professionals and consultants from three different firms, to identify the source of the breach, diagnose its cause, and implement appropriate solutions. To date, these expenses alone cost approximately $400,000, and have effectively shut down outside entry into the Debtor's IT

---

[5] CPP stands for "common point of purchase," and is a way for credit card banks to trace fraud associated with use of their cards. For example, if an unusually high percentage of American Express cards with questionable charges were earlier used to make legitimate purchases at a particular chain of toy store franchises, then that would suggest the likelihood that the data breach that made the cards susceptible to fraudulent charges originated within the data systems of the toy store franchisor.

network by severely restricting access via the employment of individual authentication mechanisms, VPN access, or specifically vetted "whitelists" of pre-approved IP's.

19. Finally, the discovery of the data breach triggered a number of legal requirements and regulatory obligations, including the provision of notice by mail to individuals whose information may have been accessed. Because the Debtor was unable to determine a particular subset of persons or data files that had been hacked, the Debtor had no choice but to work under the assumption that *all* of the information within its servers were compromised. As a result, the Debtor had to spend in excess of $3.8 million to mail well over seven million individual notices that began to go out on Thursday, June 6, 2019. This required more liquidity than the Debtor had available. As a result, and in order to ensure that appropriate notice of the data breach was provided to all individuals possibly affected, the Debtor obtained a secured loan from my personal funds in the amount of $2.5 million, which together with existing cash-on-hand was sufficient to fund mailing of the notices.[6]

20. In the wake of all the foregoing, including the loss its largest clients, the Debtor also had no choice to substantially reduce its workforce, from 113 employees at year-end 2018, to just 25 as of the Petition Date.[7] The Debtor no longer is optimistic that it will be able to rehabilitate its business.[8]

---

[6] In addition to the costs of mailing, the Debtor has additional ongoing expenses related to the mailing. For example, affected recipients in certain states and regarding whom particular types of information may have been compromised may, if they desire, obtain two years of third party credit monitoring at the Debtor's sole expense.

[7] The Debtor also has a contractual relationship with a call center that is run on its behalf in Navi Mumbai, India. However, call center personnel are not employees of the Debtor or any affiliate.

[8] While the Debtor was encouraged by the emergence of some significant clients that expressed an interest in continuing business with the Debtor, that prospect was quickly undermined by Visa and Mastercard, who insisted on onerous and impossibly expensive conditions (including the likely imposition of contractual "fines") on the Debtor's going-forward ability to accept credit card payments (which they gave no assurances would be processed *even if the conditions were met*) in what seemed to me to be short-sighted refusal to work in good faith with a long-standing customer with which they had never had any issues before.

21. Accordingly, the Debtor has filed the instant chapter 11 petition in order to allow it the breathing room to appropriately evaluate its pool of remaining assets and liabilities, cost-effectively respond to regulatory demands, and ultimately, to wind-up of its business in an orderly fashion through a liquidating chapter 11 plan.

## II.    First Day Motions

22. Contemporaneously with the filing of this Declaration, the Debtor has filed the First Day Motions, and, at the "first day" hearing, will seek orders granting various forms of relief.

23. I have reviewed each of the First Day Motions or have otherwise had their contents explained to me, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above, and ultimately, will be critical to the Debtor's ability to maximize the value of its assets for its stakeholders.

> A. *Debtor's Motion Pursuant To Section 105(a) Of The Bankruptcy Code: (A) For Order Authorizing And Approving Procedures For Managing Governmental Requests and/or Demands For Information; and (B) For an Emergency Order Enjoining Related Governmental Action Pending Court's Consideration Of Such Procedures, and Granting Related Relief*

24. As detailed above, the Debtor has been driven to seek relief in this Court by the discovery of a significant data security breach that brought about a host of negative consequences. Among those are not only a crush of litigation and pre-litigation activity by contract counter-parties and other private entities from whom the Debtor is now protected by virtue of section 362(a)'s automatic stay, but also a host of requests and demands made by

numerous governmental authorities, all related to the data security breach sustained by the Debtor.

25. The Debtor lacks both the human and financial resources to strictly satisfy those requests and meet those demands, which would try even the healthiest of companies, much less one that has just lost most of its clients, as the Debtor has. I am advised by counsel, however, that the automatic stay may not apply to protect the Debtor from governmental units, at least not in all cases.

26. The Debtor recognizes the legitimate interests of appropriate governmental authorities to obtain information relevant to the data breach incident. Indeed, a significant factor in the Debtor's decision to seek relief in this Court was its desire to be as responsive to legitimate governmental information requests as its condition will allow, through a process that is sufficiently coordinated and streamlined so as to be accommodated within the tight constraints in which the Debtor finds itself. Accordingly, the Debtor seeks approval of proposed procedures that would accommodate the legitimate desires for information on the part of various governmental entities while at the same time limiting the burden on the Debtor to a level that it can bear, and reducing the risk of redundancy and duplication.

> B. *Debtor's Motion for Entry of Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "**Schedules and SOFAS Motion**")*

27. The Debtor requests entry of an order granting additional time to file its schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules**"). As a consequence of the numerous critical operational and regulatory matters that the Debtor's management and remaining team of employees have been inundated with in the weeks leading to the chapter 11

filing, a 45-day extension (without prejudice to further extensions) is necessary and appropriate.

28. To prepare the Schedules, the Debtor must compile information from books, records, and other documents relating to, among other things, accounts payable and receivable, leases, employee wages and benefits, and contracts in connection with their debt collection operations. Collecting the necessary information to prepare the Schedules requires a substantial expenditure of time and effort on the part of the Debtor, its employees, and its professionals. I believe an extension of the time to file the Schedules will ultimately maximize the value of the Debtor's estate for the benefit of its creditors and all other parties in interest.

    C. *Debtor's Motion for Interim and Final Orders: (I) Authorizing Continued Use of Existing Cash Management Practices, Bank Accounts, and Business Forms; and (II) Authorizing the Continuance of Intercompany Transactions (the "**Cash Management Motion**").*

29. Under the Cash Management Motion, the Debtor requests the entry of interim and final orders authorizing, but not directing, the Debtor to continue using its existing cash management practices, bank accounts, and business forms.

30. The Debtor utilizes ordinary cash management practices (the "**Cash Management Practices**") that help control and monitor receipts and disbursements. The Cash Management Practices and applicable procedures employed by the Debtor constitute customary and essential business practices. I believe that it would be unduly difficult and expensive for the Debtor to establish new cash management practices. I believe that allowing the existing Cash Management Practices to remain in place will facilitate a smoother transition into Chapter 11.

31. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor and all other parties in interest, and will make the Debtor's transition into

chapter 11 smoother, less costly, and more orderly.  Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be approved.

    D. *Debtor's Motion For Entry Of Interim And Final Orders Authorizing The Debtor to: (I) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses; and (II) Continue Employee Benefits Programs (the "**Wages Motion**")*

32.    The Debtor seeks authority from the Court to pay prepetition employee wages and satisfy related benefit obligations in the ordinary course.  The Debtor's employees perform a wide variety of functions which will be critical to the administration of the Debtor's chapter 11 case.  Without their continued, uninterrupted services, the ability of the Debtor to maintain and administer its estate will be materially impaired.

33.    Many of the Debtor's remaining employees rely on their compensation and benefits to pay their daily living expenses.  These individuals could experience significant financial constraints if the Bankruptcy Court does not permit the Debtor to continue paying their compensation and providing them with health and other benefits.  Accordingly, on behalf of the Debtor, I respectfully submit that the Wages Motion should be approved

    E. *Debtor's Motion For Order Establishing Certain Notice, Case Management, and Administrative Procedures (the "**Case Management Motion**")*

34.    This Case Management Motion would , among other things: (i) establish requirements for filing and serving notices, motions, applications, declarations, objections, responses, memoranda, briefs, supporting documents, and other documents filed in the Debtor's chapter 11 case; (ii) delineate standards for notices of hearings and agenda letters; (iii) fix periodic omnibus hearing dates and articulate mandatory guidelines for the scheduling of hearings and objection deadlines; and (iv) limit matters that are required to be heard by the Court.  Although I am not an attorney nor do I have personal experience with the chapter 11

process, I am advised by counsel that the procedures such as those proposed by the Case Management Motion are helpful in maximizing efficiency and judicial economy in a case, as well as balancing the need for parties to receive appropriate notice with the need to minimize the attendant burden on the Debtor's estate. Those are all important considerations that will help the Debtor through its own chapter 11 case, and it is for this reason that, on behalf of the Debtor, I submit that the Case Management Motion should be granted.

### III. Additional Disclosures Required By Local Rule 1007-2

35. Local Bankruptcy Rule 1007-2 requires the Debtor to provide certain information, which is set forth below.

36. Local Bankruptcy Rule 1007-2(a)(2) is not applicable to the Debtor's chapter 11 case because it was not originally commenced as a chapter 7 or chapter 13 case.

37. Local Bankruptcy Rule 1007-2(a)(3), is not applicable to the Debtor's chapter 11 case because the Debtor is not aware of any committee that existed before the filing of this case.

38. Local Bankruptcy Rule 1007-2(a)(4) requires the Debtor to include the following information with respect to each of the holders of the Debtor's twenty 20 largest unsecured claims, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), telephone number, the name(s) of person(s) familiar with the Debtor's accounts, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed or partially secured. That information is provided on Official Form 204, which is annexed to the Debtor's chapter 11 petition filed contemporaneously herewith. In each case, the claim amounts listed on Official Form 204 are estimated and subject to verification. In addition, the Debtor's reserves its rights to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

39. Local Bankruptcy Rule 1007-2(a)(5), requires that the Debtor list the holders of the five largest secured claims against each Debtor. As of the Petition Date, there is only one holder of secured claims against the Debtor, Russell H. Fuchs, on account of the loan made and described in **Part I**, made to permit the Debtor to fulfill its noticing obligations to potentially affected parties after learning of the data security breach, as described in **Part I**. The loan is secured by substantially all of the Debtor's assets.

40. Local Bankruptcy Rule 1007-2(a)(6) seeks a summary of the unaudited assets and liabilities for the Debtor. That is included in the Debtor's chapter 11 petition filed contemporaneously herewith. More details will be available once the Debtor files its Schedules and Statement of Financial Affairs.

41. Local Bankruptcy Rule 1007-2(a)(7) is not applicable to the Debtor's chapter 11 case because the Debtor is a privately-held corporation and therefore has no public shareholders.

42. Local Bankruptcy Rule 1007-2(a)(8) seeks a list of all of the Debtor's property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending. The only property arguably falling within this category is a letter of credit in the amount of $85,000 in favor of the lessor of the Debtor's headquarters, which is secured by funds held at an account at Bank of America.

43. Local Bankruptcy Rule 1007-2(a)(9) seeks a list of the premises owned, leased, or held under other arrangement from which the Debtor operates its business. The Debtor has no locations other than its headquarters at 4 Westchester Plaza in Elmsford, New York.

44.     Under Local Bankruptcy Rule 1007-2(a)(10), the Debtor must identify the location of the Debtor's substantial assets, and the location of its books and records. All such assets, books and records are principally located at the Debtor's headquarters at 4 Westchester Plaza in Elmsford, New York.

45.     Local Bankruptcy Rule 1007-2(a)(11) requires the Debtor to disclose "the nature and present status of each action or proceeding, pending or threatened, against the debtor or its property where a judgment against the debtor or a seizure of its property may be imminent." The Debtor is aware of no such actions or proceedings.

46.     As required under Local Bankruptcy Rule 1007-2(a)(12), **Exhibit "A"** provides a list of the names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

47.     Copies of the resolutions authorizing the filing of the Debtor's chapter 11 petition are annexed thereto.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: Elmsford, New York
June 17, 2019

By: /s/ Russell Fuchs
Russell H. Fuchs

## Exhibit A

| Name | Title | Tenure | Responsibilities |
|---|---|---|---|
| Russell Fuchs | CEO | 40+ years | Russell Fuchs was the founder of the business, and he was responsible for the oversight of the company's business activities. |
| Jeffrey Wollman | CFO and COO | 30+ years | Mr. Wollman managed the daily business and financial operations of the company. |
| Bradley Scher | Chief Oversight Officer | Mr. Scher was retained prior to the Debtor's chapter 11 filing. | Mr. Scher was retained to assist in the orderly wind down of the Debtor's estate and the maximization of estate value. |