**The New York Times**
620 8TH AVENUE · NEW YORK, NY 10018

# PROOF OF PUBLICATION

Sept 30, 2019

I, Alice Weber, in my capacity as a Principal Clerk of the Publisher of *The New York Times*, a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of *The New York Times* on the following date or dates, to wit on

SEP 30 2019   B4   NATIONAL

*Alice Weber*

Sworn before me the 30th day of Sept, 2019

*Michelle M. Scibilia*

Notary Public

MICHELLE M. SCIBILIA
Notary Public, State of New York
Registration #01SC6281145
Qualified in Nassau County
Commission Expires May 13, 2021

[Newspaper clipping: Notice of Deadline Requiring Submission of Proofs of Claim on or before November 19, 2019 — United States Bankruptcy Court, Southern District of New York, In re: Retrieval-Masters Creditors Bureau, Inc., Case No. 19-23185 (RDD)]

# TECHNOLOGY

## Why California Has Better Data Protections

A wealthy activist is pushing a ballot initiative that would broaden privacy rights in the Golden State.

**This Week in Tech**
By NATASHA SINGER

Greetings from New York Times headquarters in Midtown Manhattan.

While many eyes were focused on the impeachment saga playing out in Washington, one person in San Francisco was taking on the entire tech industry. Again.

In 2017, Alastair Mactaggart, a wealthy real estate developer, founded and started financing a push for data rights for Californians. The effort led California lawmakers to enact the nation's most comprehensive state consumer privacy law last year. Ever since then, tech companies and industry groups have maneuvered to water down its consumer protections.

Now Mr. Mactaggart is back with a new campaign.

He's starting a ballot initiative that would amend the new law, the California Consumer Privacy Act, which takes effect on Jan. 1. He wants broader data control rights for Californians and new requirements on companies.

Among other things, his amendments would triple the law's fines for violations of children's privacy.

The ballot initiative also has a political component. It would require companies that profited from using Californians' personal data for election influence campaigns to disclose their practices to consumers and the state authorities.

When it comes to privacy protections, it seems, Californians have a big advantage over many other Americans. And not just because California was the first state to pass laws requiring companies to disclose data breaches and the first to grant minors the right to erase their online posts and photos.

The privacy laws illustrate differing governmental views on citizens' rights.

The United States Constitution, for instance, does not explicitly grant an inalienable right to privacy. Although the Fourth Amendment protects people from unreasonable government searches and seizure, it does not safeguard us against intrusive and ubiquitous snooping by tech giants and other corporations.

The Constitution of California, however, grants a right to privacy — putting it on equal footing with the rights to life, liberty, the pursuit of happiness, freedom of speech and freedom of religion.

The Charter of European Union goes even further. It recognizes privacy and, separately, the protection of personal data as fundamental human rights.

"If you think about our other fundamental rights as a country, no one is spending millions and millions of dollars trying to undermine the First Amendment or the freedom of religion," Mr. Mactaggart told me. "But people are actually spending hundreds of millions of dollars trying to undermine privacy because there's so much money in it for corporations."

**Limiting the Right to Be Forgotten**

While Mr. Mactaggart was working to expand the right to privacy in California,



Alastair MacTaggart, the founder and board chair of Californians for Consumer Privacy, wants the California Consumer Privacy Act amended. AL DRAGO/BLOOMBERG

Europe's highest court issued landmark decisions narrowing it.

The rulings involved a law, popularly known as the "right to be forgotten," which gives people in the European Union a legal means to delete certain personal information about them online. In practical terms, that means Europeans can use their right to be forgotten to require Google and other search engines to delete links to news articles or sites containing personal details about them that are outdated, inaccurate or not in the public interest.

But on Tuesday, as my colleague Adam Satariano reported from London, the European Court of Justice ruled that the right to be forgotten does not apply outside the European Union. The court also said the right to delete certain personal data must be balanced against the public's right to know.

The ruling was a victory for Google and other search engines, Adam wrote. It means that the tech giant will not be required to take down links outside the European Union. It may also give Google and other companies more leeway to refuse certain deletion requests in the name of the public interest.

But defending the public's right to know can also have intended consequences.

In a riveting article, Adam profiled a journalist in Italy, Alessandro Biancardi, who lost a legal battle to preserve an article about a pair of brawling brothers. The story covered the stabbing of one brother by another at a seaside restaurant.

The brother who was stabbed wanted the article about the incident deleted and sued the journalist, citing his right to be forgotten, Adam reported. The journalist, however, refused to take down the article.

The European court's new ruling limiting the right to be forgotten may help local publications in the European Union defend and preserve such news coverage.

But for Mr. Biancardi, it is too late. The journalist lost the lawsuit over the article about the brawling brothers. Faced with many other privacy and article-deletion demands, including 40 lawsuits, Mr. Biancardi shut down his news site last year.

**Some Stories You Shouldn't Miss**

■ Amazon wants to turn every suburban home into a surveillance station. An article in Wired by Louise Matsakis looked at how video clips from the company's Ring doorbell camera, posted on social networks, are becoming fodder for local TV news stations.

■ File this under corporate cognitive dissonance. Amazon — the company under scrutiny by civil rights and civil liberties groups for its sales of facial recognition technology to law enforcement — is writing a model facial recognition law, my colleague Karen Wiese reported.

■ Four years working at start-ups can take a toll on the soul, Anna Wiener recounted in The New Yorker.

■ Are you an A.I. have or have-not? Computer scientists say research in artificial intelligence is becoming so costly that few institutions have the computing power to develop innovations like self-driving cars, my colleague Steve Lohr reported.

■ One of our favorite new colleagues says Times reporters are Slack shy. "Slack culture in the newsroom is rather ...quiet," wrote Davey Alba, who covers disinformation and joined us in August.

■ We always knew this privacy professor was a genius. Now the Catherine T. MacArthur Foundation has confirmed it. The foundation on Wednesday awarded one of its annual "genius" grants to Danielle Citron, a law professor at Boston University, who has worked to counter revenge porn and other online abuses. Professor Citron's TED Talk on "deepfakes" has been viewed nearly 900,000 times. Read her book, "Hate Crimes in Cyberspace," for more.

---

## Ahead of 2020, Facebook Falls Short on Plan to Share Data on Disinformation

FROM FIRST BUSINESS PAGE

ally releases is expected to be far less comprehensive than originally described.

As a result, researchers say, the public may have little more insight into disinformation campaigns on the social network heading into the 2020 presidential election than they had in 2016. Seven nonprofit groups that have helped finance the research efforts, including the Knight Foundation and the Charles Koch Foundation, have even threatened to end their involvement.

BuzzFeed News earlier reported on researchers' concerns over delays in Facebook's data sharing project.

"Silicon Valley has a moral obligation to do all it can to protect the American political process," said Dipayan Ghosh, a fellow at the Shorenstein Center at Harvard and a former privacy and public policy adviser at Facebook. "We need researchers to have access to study what went wrong."

Political disinformation campaigns have continued to grow since the 2016 campaign. Last week, Oxford researchers said that the number of countries with disinformation campaigns more than doubled to 70 in the last two years, and that Facebook remained the No. 1 platform for those campaigns.

But while company executives express an eagerness to prevent the spread of knowingly false posts and photos on the social network, by far the world's largest, they also face numerous questions about their ability to secure people's private information.

Revelations last year that Cambridge Analytica, a political consulting firm, had harvested the personal data of up to 87 million Facebook users set off an outcry in Washington. In the months after the scandal, Facebook cut off many of the most common avenues for researchers accessing information about the more than two billion people on the service. This past July, it also agreed with federal regulators to pay $5 billion for mishandling users' personal information.

"At one level, it's difficult as there's a large amount of data and Facebook has concerns around privacy," said Tom Glaisyer, chairman of the group of seven nonprofits supporting the research efforts.

"But frankly, our digital public square doesn't appear to be serving our democracy," said Mr. Glaisyer, who is also the managing director of the Democracy Fund, a nonpartisan group that promotes election security.

Elliot Schrage, Facebook's vice president of special projects, who oversees the initiative, defended the company's efforts.

"The whole reason Mark announced this program in the first place is he believes that the most productive and instructive debates are driven by data and independent analysis," Mr. Schrage said in an interview. "I know of no

private company that has invested more to build tools and technologies to make private data publicly available for public research."

Three months after Mr. Zuckerberg spoke in Washington last year, Facebook announced plans to provide approved researchers with detailed information about users, like age and location, where a false post appeared in their feeds and even their friends' ideological affiliation. Dozens of researchers applied to get the information.

The company partnered with an independent research commission, Social Science One, which had been set up for the initiative, to determine what information could be sent to researchers. Facebook and Social Science One also brought in the Social Science Research Council, an independent nonprofit organization that oversees international social science research, to sort through the applications from academics and conduct a peer review and an ethical review on their research proposals.

But privacy experts brought in by Social Science One quickly raised concerns about disclosing too much personal information. In response, Facebook began trying to apply what's known in statistics and data analytics as "differential privacy," in which researchers can learn a lot about a group from data, but virtually nothing about a specific individual. It is a method that has been adopted by directors at the Census Bureau and promoted by Apple.

Facebook is still working on that effort. But researchers say that even when Facebook delivers the data, what they can learn about activity on the social network will be much more limited than they planned for.

"We and Facebook have learned how difficult it is to make" a database that was not just privacy-protected but at a "grand scale," said Nate Persily, a Stanford law professor and co-founder of Social Science One.

Facebook said researchers had

*A company struggling to share information while also protecting users' privacy.*

access to other data sets, including from its ads archive and Crowdtangle, a news-tracking tool that Facebook owns. Two researchers said they and others visited Facebook's headquarters in California in June this year to study the available data set.

And both Facebook and Social Science One said they would continue to make more data available to researchers in time. In September, the two released 32 million links that included data about whether users labeled millions of posts as fake news, spam or hate speech, or if fact-check organizations raised doubts about the posts' accuracy. It also included how many times stories were shared publicly and the countries where the stories were most shared.

Facebook's effort is a "tremendous step forward," said Joshua Tucker, a professor at New York University studying the spread of polarizing content across multiple platforms. "In the long term, if methods for making these data available for outside research are successfully implemented, it will have a very positive impact."

But other researchers say the existing databases are severely limiting. And some say that Facebook's concerns about privacy are overblown.

Ariel Sheen, a doctoral student at Universidad Pontificia Bolivariana in Medellin, Colombia, whose research team has been through the Social Science One approval process but has not yet received the data, said his group has uncovered on its own hints of a large coordinated campaign in Venezuela.

His group believes it has found more than 3,000 still-active fake Facebook accounts — profiles run by people impersonating others, for example — that are spreading false information. The accounts, Mr. Sheen said, are tied to Telesur, a Latin American television network largely financed by the Venezuela government.

But because Facebook is not providing the original data described, Mr. Sheen said, his team's work cannot proceed as planned.

"We believe that it is imperative for our research to continue as was originally agreed to by Facebook," he said.

Mr. Glaisyer of the Democracy Fund said it is important that researchers "can operate independently" but that Facebook "may consider other ways of granting researchers and analysts access such as on-site — as the Census Bureau does." Mr. Sheen said that is precisely what his team has proposed.

Facebook said there were other possibilities for sharing data with researchers but that it could not commit to specific methods at this point.

Philip Howard, director of the Oxford Internet Institute, a department at Oxford University studying the use of social media to spread misinformation, said his team deliberately chose not to participate in the Facebook and Social Science One data sharing project.

"It takes so frustratingly long to get data sets that it's easier for us to build our own tools and push the science forward on our own," Mr. Howard said.

But Samantha Bradshaw, a researcher who works with Mr. Howard, said that collecting their own data for research is also limiting.

"It's only a small glimpse into what are very big broad phenomenons," she said.

---

[Bankruptcy Legal Notice — Retrieval-Masters Creditors Bureau, Inc. — Case No. 19-23185 (RDD), NOTICE OF DEADLINE REQUIRING SUBMISSION OF PROOFS OF CLAIM ON OR BEFORE NOVEMBER 18, 2019, U.S. Bankruptcy Court, Southern District of New York. Detailed notice text regarding filing proofs of claim, deadlines, procedures, and attorney contact information.]

**Legal Notice**

The Connecticut Department of Transportation will be conducting its annual prequalification of professional consultant firms who desire to provide services for the 2020 calendar year. Additional information can be obtained at: www.ct.gov/dot/business/consultantselection

Submittals must be hand delivered by 3:00 pm on Friday, November 15, 2019 or postmarked by this date and received by November 20th. No submittals will be accepted after these dates.

Connecticut Department
of Transportation
An EO/AA/ADA Employer